UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CORNELIUS BARNES, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:15-CV-141 JD |
| | ) |
| NORTHERN INDIANA PUBLIC | ) |
| SERVICE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This is an employment case arising out of *pro se* plaintiff Cornelius Barnes, Jr.'s employment as an apprentice lineman with Northern Indiana Public Service Company (NIPSCO), a public utility for natural gas and electricity services. Barnes alleges that NIPSCO discriminated against him because he is African American, retaliated against him for filing an internal complaint of discrimination in January 2014, and created a hostile work environment. Discovery has now closed and NIPSCO moved for summary judgment [DE 55], while giving the *pro se* plaintiff proper notice concerning his need to respond to the motion with evidence or risk an adverse judgment [DE 59]. Not only did Barnes respond and provide hundreds of pages of legitimate business records and emails from NIPSCO, but he filed his own motion for summary judgment [DE 61], along with additional evidence. The motions are fully briefed and ripe for consideration.

As a preliminary matter, the Court would note that the only evidence objected to concerns deposition excerpts filed by Barnes in support of his reply brief [DE 71-1]. NIPSCO filed a motion to strike this evidence or, in the alternative, sought leave to file a sur-reply [DE 72]. NIPSCO claims that the deposition excerpts constitute "new evidence" that was filed too

late during the briefing process. NIPSCO also argues that Barnes' reply brief improperly mischaracterizes the deposition testimony. Contrary to NIPSCO's argument, the various deposition excerpts provided by Barnes are not "new evidence." Rather, NIPSCO relied on these very same depositions (albeit different excerpts) in seeking its summary judgment. In fact, the case that NIPSCO relies on, *Baugh v. City of Milwaukee*, demonstrates that introducing additional pages of deposition transcripts to clarify portions of those depositions first submitted by the opposing party is not new evidence. 823 F. Supp. 1452, 1457 (E.D. Wis. 1993), *aff'd*, 41 F.3d 1510 (7th Cir. 1994). And to the extent Barnes mischaracterizes the deposition testimony in his reply brief, Barnes' argument is not evidence and the Court is capable of discerning the true contents of those depositions. In any event, the Court does grant NIPSCO leave to file its sur-reply [DE 72-1], because its consideration does not change the outcome of this Order.

For the reasons that follow, after liberally construing Barnes' *pro se* claims, the Court denies the motions for summary judgment as to Barnes' race discrimination and retaliation claims; but as to the hostile work environment claim, the Court grants NIPSCO's motion and denies Barnes' motion.

## I.  STANDARD OF REVIEW

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

Finally, the fact that the parties have cross-filed for summary judgment does not change the standard of review. *M.O. v. Ind. Dep't of Educ.*, 635 F. Supp. 2d 847, 850 (N.D. Ind. 2009). Cross-motions are treated separately under the standards applicable to each. *See Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 915 (7th Cir. 2012).

## II.  FACTS

Since June 2009 Barnes has worked various jobs at NIPSCO, until he successfully bid on a position in the lineman apprenticeship program in September 2011. The forty-eight month program consists of eight steps, with apprentices moving to the next step every six months while completing approximately twenty on-the-job tasks at each step [DE 65-1 at 140-49; DE 58-1 at 12-13]. At the end of every six months in the program, an apprentice must also pass a written and hands-on performance evaluation at the Human Performance Improvement Center (or training center). NIPSCO assumes responsibility for providing appropriate work assignments needed by an apprentice to allow for successful completion of the program.

Throughout the program an apprentice also receives monthly apprentice reports which are expected to document observations made by the on-site journeyman lineman. The

3

journeyman makes any comments on the form and then separately ranks the apprentice's attitude, ability, performance, and overall conduct as excellent, strong, average, marginal, or unsatisfactory. The journeyman must then determine whether the overall report should be characterized as "acceptable" or "unacceptable." The direct supervisor and the apprentice are then expected to sign the monthly report. If an apprentice received three unacceptable reports, NIPSCO's written policy required a field evaluation to be conducted [DE 65-1 at 25]. However, NIPSCO also claims that it had an unwritten "process" of disqualifying an apprentice from the program after three unacceptable reports. But, other than Barnes, NIPSCO did not identify an apprentice lineman that was disqualified for receiving three unacceptable reports and without conducting a field evaluation.[1]

It is undisputed that Barnes obtained his first unacceptable report in August 2012 and his second unacceptable report in May 2013 while working for the line construction department [DE 58-1 at 49-53]. In June 2013, Barnes was advised that his unacceptable reports put him at risk for disqualification from the apprenticeship. Barnes voiced his disagreement with the assessments of his performance, but he did not express concerns associated with discrimination. It is the events following his receipt of the first two unacceptable reports which are central to Barnes' claims.

Barnes received acceptable reports from July through September 2013 [DE 62-3 at 2-3] and passed a field evaluation to ensure that Barnes had the skills to work without supervision [DE 58-11]. In September 2013, Barnes was promoted to working in the Goshen district as a Step 5 apprentice lineman, where he reported directly to Johnese McKinney (African American), who reported directly to Matthew Fleck (Caucasian), who reported to Lou DeFelice (Caucasian).

---

[1] While NIPSCO indicates that Jim Buyer (Caucasian) was disqualified from the lineman apprenticeship, the timing and actual basis for his disqualification were not specified [DE 58-12 at 3].

4

Per NIPSCO's written policies, when an apprentice lineman in any operating district reaches Step 5—like Barnes had—he "shall start receiving his field training on standby work[2] as his turn comes up." [DE 65-1 at 95]. Despite the written policy, Barnes was not given the opportunity to be trained for standby work [DE 58-1 at 33-34]. However, three other Step 5 apprentice linemen (who also transferred into the Goshen district from line construction) were immediately afforded training for standby work. In fact, one of them was apparently offered the opportunity to actually perform standby work immediately upon entering the district. It is uncontested that of these Caucasian apprentice linemen, Sam Eli, Brett Huff, and Mike Becker, none of them had unacceptable monthly performance evaluations. NIPSCO had also received complaints about Barnes and had documented concerns from late 2013 indicating that maybe Barnes could not safely perform the duties of a Step 5 apprentice lineman, which included performing standby work often done without supervision.

Despite these alleged concerns, Barnes received another acceptable report on October 25, 2013 [DE 62-4]. Then in December 2013, Barnes was involved in a verbal altercation with journeyman lineman Brian Thomas (Caucasian). But once McKinney intervened, Barnes was able to calm down and complete the job with no safety issues noted [DE 58-10 at 2-4]. Later that month and into January 2014, NIPSCO supervisors, including Fleck, DeFelice, and Richard Brindley from the training center, received complaints about Barnes' deficient performance [DE 58-9 at 3, 12-15]. However, Barnes was not informed of these other performance concerns until January 23, 2014. At that time, Barnes was advised that a meeting was to take place the following day in order to discuss his performance, aptitude, ability, and safety.

---

[2] Neither party details the exact nature of standby work or the type of training necessary to be eligible and qualified for standby work; however, NIPSCO's CBA indicates that performing standby work allows for additional compensation.

During that meeting, the union representative and DeFelice discussed putting Barnes on a separate Training Plan which would require Barnes to work in Warsaw,[3] be subjected to weekly reviews, maintain "[s]tellar performance," and receive only acceptable monthly reports [DE 58-9 at 9-10]. Because it was apparently anticipated that Barnes' November/December 2013 report would ultimately be marked unacceptable, that particular monthly report would not count against Barnes; rather, any further unacceptable report would be cause for Barnes' disqualification from the apprenticeship. *Id*.

Barnes believes that the Training Plan made it easier to disqualify him on primarily subjective measures spanning a month's worth of work, as compared to the written policy (that applied to the Caucasian apprentice linemen), which allowed for disqualification only by failing to complete on-the-job tasks or failing controlled performance evaluations. NIPSCO does not offer evidence to contradict Barnes' assessment that the Training Plan was more subjective in nature.

On January 27, 2014, Barnes filed an internal complaint of discrimination with NIPSCO. On February 18, 2014, an internal investigation concluded that Barnes' claim of discrimination on the basis of race was unsubstantiated. It concluded that based on admissions made by Barnes during the investigation [DE 58-1 at 36; DE 58-6 at 3], he had reacted in response to an anticipated unfavorable apprentice report.

Within a matter of days, Barnes was given the investigative results, along with his November/December 2013 monthly report which had now been marked unacceptable—the

---

[3] Barnes would not be eligible for overtime (call out work or extension of the workday) while working in Warsaw, but that was only because he would remain on the overtime list in Goshen and no apprentice lineman could be on two overtime lists at the same time [DE 58-10 at 3].

document reflects that the journeyman and McKinney didn't fill it out and sign it until the beginning of February [DE 58-1 at 54]. The comments on the form indicated that there were concerns about whether Barnes had a "full understanding for [a] 5th Step apprentice." On February 19, 2014, Barnes' separate Training Plan (designed specifically for him) was implemented [DE 58-1 at 55]. Barnes was not given a field evaluation in accordance with NIPSCO's written policy, despite the fact that NIPSCO's Senior Human Resource Consultant, Jennifer Barbour, testified during her deposition that the applicable written policy should have been followed [DE 71-1 at 124-25].

While working in Warsaw from mid-January to mid-April 2014, Fleck questioned whether recent mistakes made by Barnes on-site were on account of poor performance or just inexperience [DE 58-4 at 13-14]. Despite these concerns, Barnes received weekly reports indicating that he was "meet[ing] expectations," and he received monthly reports from January/February and March/April which were both marked acceptable [DE 62-8 at 2; DE 62-11 at 2-25]. Even after receiving months' worth of acceptable reports, Barnes was still not afforded training for standby work when he returned to the Goshen district in mid-April—for which Fleck was unable to explain [DE 58-4 at 7].

Upon returning to the Goshen district, Barnes received three weekly reports reflecting that he had "marginal performance" and four weekly reports reflecting that he was "meet[ing] expectations." [DE 62-12 at 2-15]. The reports reflecting marginal performance indicated that Barnes was not as knowledgeable as he should be for a Step 6 apprentice lineman and that he just needed more experience.

On May 29, 2014, journeyman lineman McNamara filled out Barnes' April/May 2014 monthly report [DE 65-1 at 31, 120]. He ranked Barnes as being strong in good attitude, average

7

in performance and overall conduct, and marginal in ability. McNamara commented on the report that Barnes' "[a]bility is behind current [6th] step of progression." At that time, McNamara did not mark the monthly report acceptable or unacceptable because he "wanted to talk to the training center and get some guidance on where they felt we should have been." [DE 58-7 at 5]. McKinney signed it on the same day and noted that Barnes' performance was fluctuating; however, she assumed McNamara would mark the report as acceptable [DE 71-1 at 16-17].

Although McNamara's deposition testimony indicates that no one later approached him about marking the report unacceptable, an email conversation between DeFelice, Fleck, and McKinney on June 19 reflects the following: First, Fleck emailed DeFelice indicating that "we need to decide what we're going to do with [Barnes] . . . we still need to decide on this last apprentice report also." [DE 65-1 at 107-08]. DeFelice then asked whether McNamara marked "unacceptable on the latest apprentice report after he was given that the eval is being 6 the step [sic]?" *Id*. Fleck then forwarded the email to McKinney asking "[d]id you ask Steve [McNamara] what he was going to mark on the report?" *Id*. In response, McKinney indicated that McNamara would need to mark the monthly report acceptable because only having one marginal ranking did not equate to an overall unacceptable evaluation. *Id*. McKinney's response prompted DeFelice to state: "We are getting our hands tied on this. No unacceptable evals and nothing that really stands out in the weekly. . . [t]raining and HR pretty much agrees [sic] we don't have a case. Perhaps Steve's report will change in entirety based on 6th step info. We will talk more when I return." *Id*. Sometime thereafter, McNamara marked the report unacceptable [DE 65-1 at 120] and commented on the report that Barnes "sometimes has some comprehension issues" and some incidents with him caused McNamara to opine that Barnes' "skill level was behind a typical 6th step apprentice." [DE 58-7 at 3-9]. Barnes disputed that he was performing

unacceptably given that he had not received any negative feedback since February and none of his weekly reports were characterized as unacceptable.

On June 27, 2014, DeFelice determined that Barnes would be disqualified from the lineman apprenticeship because he received another monthly report that was marked unacceptable [DE 65-1 at 109]. Yet, even Fleck later acknowledged in his deposition that the monthly report should "probably not" have been deemed unacceptable [DE 58-4 at 8]. In fact, Barnes had received a monthly report back in March 2013 that had lower rankings but was deemed acceptable [DE 58-9 at 6]. In addition, Barnes had another report in April 2013 with the exact same rankings as the April/May 2014 report, but the earlier report was deemed acceptable [DE 58-9 at 7].

Barnes was not informed of his disqualification until July 10, 2014, which was after he worked storm duty from July 1-4 and received another satisfactory weekly report for work conducted on June 16-22 [DE 71-1]. DeFelice explained that Barnes was allowed to continue working as an apprentice lineman under supervision until another position became available for Barnes. Barnes' disqualification, which the parties agree constitutes an adverse action, resulted in Barnes being sent back to his previous position as a meterman [DE 62-10], a job that pays less per NIPSCO's CBA.

Outside of his unacceptable monthly reports, the record does not support Barnes ever having any safety violations during his apprenticeship. Barnes also performed and passed all of the requisite written and performance tests taken at the training center during his lineman apprentice program, as confirmed by John Cochran who worked at NIPSCO's training center [DE 58-2 at 3-4]. Barnes even completed nearly one hundred on-the-job tasks.

On August 20, 2014, Barnes filed an internal complaint of retaliation with NIPSCO. After learning that NIPSCO would not investigate the complaint until Barnes' grievance concerning his disqualification was finalized, Barnes filed his EEOC charge on September 11, 2014, alleging race discrimination and retaliation [DE 58-1 at 58]. After Barnes' grievance was denied, he filed his federal complaint alleging race discrimination, retaliation based on his initial complaint of discrimination, and hostile work environment [DE 1, as amended, DE 23]. Barnes admits that he has never heard anyone at NIPSCO use a racial slur or epithet, and no one has ever made any racially derogatory comments toward him [DE 58-1 at 7-8].[4]

### III.  DISCUSSION

**A.    Race discrimination**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment" because of the employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Barnes accuses NIPSCO of violating Title VII's prohibitions by discriminating against him because of his race.

There is no dispute that Barnes belongs to a protected class or that he suffered an adverse employment action[5] upon being demoted to a different job for less pay. *See, e.g., Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 341-42 (7th Cir. 2001). Accordingly, the only question is whether a jury could find that he was ultimately suspended from the lineman

---

[4] When deposed, Barnes stated that he had been called "lazy" and he assumed that the comment was based on his being black, but Barnes did not provide any supporting facts for such a discriminatory inference to be drawn [DE 58-1 at 4].

[5] That's not to say that not receiving training for standby work couldn't also pose a possible adverse action depending on the actual consequences thereof.

apprentice program because of his race. In resolving that question, the Court considers the evidence as a whole, without sorting the evidence into different categories and analyzing the categories under different tests.[6] *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

While it is true that Barnes has no evidence that anyone at NIPSCO ever made any derogatory comments based on race, he has produced evidence sufficient to permit at least an inference that NIPSCO's handling of Barnes' apprenticeship was racially motivated. To start, Barnes has shown that he was treated differently than his similarly situated Caucasian co-workers. Barnes identified three Caucasian Step 5 apprentice linemen—Sam Eli, Brett Huff, and Mike Becker—who all transferred into the Goshen district at the same time as Barnes. But unlike Barnes, they were immediately afforded training for standby work in order to gain the experience and knowledge necessary to perform standby work and be compensated for it. Throughout his entire apprenticeship NIPSCO never allowed Barnes to train under supervision for standby work. Despite refusing to afford Barnes this type of Step 5 training, NIPSCO subsequently criticized Barnes for not meeting the overall expectations of a Step 5 apprentice lineman.

NIPSCO tries to distinguish its less favorable treatment of Barnes on the fact that none of the Caucasian Step 5 apprentice linemen had ever received unacceptable monthly reports, whereas Barnes had already received two at this point. But NIPSCO's policies do not condition the receipt of training on the non-receipt of unacceptable reports such that these reports would

---

[6] The *McDonnell Douglas* burden-shifting framework also remains available as a means of defeating summary judgment, *Ortiz*, 834 F.3d at 766, though the Court need not reach that framework as to this claim.

11

indicate that the linemen were not directly comparable "in all material respects." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) (citing *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011)). Rather, per the written policy, all Step 5 linemen are to be trained for standby work.

It is true that NIPSCO has submitted documented concerns about Barnes' ability to safely perform unsupervised standby work, but such evidence does not necessarily explain why Barnes could not at least train for such work under direct supervision. Thus, a jury could reasonably conclude NIPSCO's safety concerns fail to justify not letting Barnes at least train for such work, similar to the training opportunities afforded to the similarly situated Caucasian apprentice linemen and in accordance with NIPSCO's written policy. *See*, *e.g.*, *Baines v. Walgreen Co.*, No. 16-3335, 2017 WL 2962887, at *5 (7th Cir. July 12, 2017) (reasoning that "[a]n employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination.") (citations omitted). Ultimately, NIPSCO disqualified Barnes for the proffered reason that he was not performing at the level expected for his apprenticeship step. Therefore, a reasonable jury could infer that because of Barnes' race, he was not afforded the same training opportunities as his Caucasian counterparts so that NIPSCO could more easily disqualify Barnes from the program. *Williams v. Office of Chief Judge of Cook Cty. Illinois*, 839 F.3d 617, 626 (7th Cir. 2016), *reh'g denied* (Nov. 30, 2016) ("to prevail by showing differential treatment of a similarly situated employee, a plaintiff must identify a comparator who is 'directly comparable to [him] in all material respects . . . to eliminate other possible explanatory variables.'") (quoting *Perez v. Thorntons, Inc*., 731 F.3d 699, 704 (7th Cir. 2013)).

In fact, the jury might also find that the Training Plan itself, further served this illegal purpose. In other words, per NIPSCO's written policy, Barnes should have been required to take

a field evaluation upon receiving his third unacceptable report. However, instead of subjecting Barnes to a controlled field evaluation, NIPSCO crafted a separate Training Plan just for Barnes. Under the terms of the Training Plan, Barnes would be disqualified if he received another unacceptable monthly report. But these reports, per Barnes, contained primarily subjective considerations over the course of a month. Thus, a jury might agree with Barnes that the Training Plan made it easier for NIPSCO to disqualify Barnes on a series of subjective observations rather than on a single controlled field evaluation which Barnes had historically been successful at completing. Additionally, none of the other white apprentice linemen were held to the tougher standards implemented by the Training Plan. *See, e.g., Baines*, 2017 WL 2962887, at *5 (citing *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012) (selective enforcement of company policy can establish pretext)).

While NIPSCO attempts to justify its creation of the Training Plan by relying on the CBA's passage giving NIPSCO broad authority to manage and control its working force [DE 67 at 5], such authority is explicitly "subject to the conditions contained in this Agreement." [DE 68-1 at 12]. A jury could find that it would defy logic to have an almost two hundred page CBA if in the end NIPSCO could handle employment matters without regard to those provisions, including the provision calling for a field evaluation in the event that a third unacceptable monthly report is received.

Finally, NIPSCO employees debate whether Barnes' last monthly report should have ever been marked unacceptable. Specifically, Barnes' African American supervisor assumed at the time that the report would be marked acceptable by McNamara. An email between NIPSCO supervisors reveals that those in the training center and human resources also thought that there was not "a case" for disqualifying Barnes. Moreover, Fleck later acknowledged that the report

was likely acceptable. Despite this, the report was deemed unacceptable and resulted in Barnes' disqualification. Thus, the facts are suspect with respect to what and who ultimately influenced that determination, especially given the series of events leading up to the Training Plan's implementation which subjected Barnes to arguably less favorable standards than his Caucasian comparators. *Ortiz*, 834 F.3d at 765 (noting that "[f]ew discrimination cases are so straightforward—indeed they are often factually complex and require sifting through ambiguous pieces of evidence."). Here, the evidence would at least permit (but not require as Barnes' argues) a reasonable factfinder to conclude that his race played a part in his ultimate disqualification from the program. *See id.*; *see also Baines*, 2017 WL 2962887, at *6 (evidence that calls an employer's truthfulness into question precludes summary judgment) (citations omitted).

In the end, a jury might not credit Barnes' evidence and could accept NIPSCO's explanations and documented concerns with Barnes' ability to safely perform the necessary work. A jury might also see NIPSCO's efforts in creating a Training Plan as NIPSCO doing even more than ordinary to facilitate Barnes' successful completion of the program. But given the conflict on material issues, summary judgment must be denied.

**B.     Retaliation**

To overcome summary judgment on this claim, Barnes needs to show that he suffered an adverse employment action, that he engaged in protected activity, and that the latter caused the former. *Williams*, 839 F.3d at 627. There is no dispute that Barnes was ultimately terminated from the lineman apprentice program after he filed an internal complaint of discrimination with NIPSCO on January 27, 2014. As to the connection between the two events, the Court finds that disputed material facts exist.

NIPSCO argues that the six months between the filing of the complaint and Barnes' disqualification is too great of a gap in time to support an inference of retaliation. But this argument overlooks the events leading up to Barnes' disqualification and the suspicious circumstances surrounding that ultimate decision.

Only twenty-three days after Barnes filed the internal complaint, NIPSCO handed Barnes his third unacceptable report and implemented Barnes' individualized Training Plan. The third report represented an evaluation for work performed back in November/December 2013, but a jury might find it suspect that it was filled out roughly one week after the internal complaint was filed by Barnes. Moreover, the actual purpose of the Training Plan could be viewed as suspect given that Barnes would normally have been given an arguably less subjective field evaluation under standard written policy. *See, e.g., Baines*, 2017 WL 2962887, at *5. Once the Training Plan was implemented, Barnes managed to receive weekly reports that passed muster. However, he was still not afforded training for standby work despite documentation indicating that he needed more experience. Barnes then received his fourth unacceptable report under questionable circumstances that need not be repeated.

Ultimately, the handling of the monthly reports and implementation of a Training Plan on the heels of Barnes' protected act, along with the questions raised concerning the characterization of Barnes' fourth report as unacceptable, create an inference of retaliation. *Tibbs v. Admin. Office of the Illinois Courts*, No. 16-1671, 2017 WL 2627822, at *3 (7th Cir. June 19, 2017) (while suspicious timing alone is rarely enough by itself, presentation of suspicious timing and pretext may defeat summary judgment). On the other hand, a jury may disbelieve the inferences that favor Barnes and find that NIPSCO's explanation is worthy of belief. But the genuinely disputed material facts require a trial on Barnes' claim for retaliation.

**C.     Hostile Work Environment**

As to Barnes' claim for hostile work environment, NIPSCO argues that Barnes never alleged such a claim in his EEOC charge of discrimination and so the claim should be dismissed for failure to exhaust administrative remedies. Barnes failed to respond to this argument. Accordingly, Barnes has not shown that the facts alleged in the EEOC charge [DE 58-1 at 58] are somehow sufficient to establish a claim of hostile work environment. If this court were to hold otherwise, any complainant, who at any time filed any manner of claim with the EEOC, could collaterally attack an adverse ruling on hostile work environment grounds. *See, e.g., Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1035 (7th Cir. 2004).

However, even if the facts supporting Barnes' discrimination and retaliation claims implicate the same conduct for purposes of his hostile work environment claim, summary judgment is proper. To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840–41 (7th Cir. 2009) (citation omitted). The environment must be both subjectively and objectively offensive. *Id.* (other citation omitted). Factors in the assessment include the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance. *Id.*

Here, any conduct that may have been connected to Barnes' race or his protected act was not subjectively or objectively severe or pervasive. Viewing the record in the light most favorable to Barnes, it cannot be said that NIPSCO's failing to provide Barnes certain training opportunities or its creation of a Training Plan which subjected him to further scrutiny created a hostile environment. *See, e.g., Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 564 (7th Cir.

2009). Even calling him lazy a time or two wouldn't create an abusive working environment. *Scruggs*, 587 F.3d at 841 (noting sporadic comments which did not rise to the level of an objectively hostile work environment under Title VII). In fact, Barnes' deposition testimony reveals that he did not personally perceive his working conditions as sufficiently offensive. *See* DE 58-1 at 47 ("[L]et the record be known, my time at NIPSCO has been great. It's just this incident that I believe that certain individuals were allowed to do things that they should not have done."). Because Barnes cannot show that the environment was subjectively and objectively severe or pervasive when viewing the facts in his favor, summary judgment is appropriate on this claim in favor of NIPSCO.

## IV.  CONCLUSION

NIPSCO's motion for summary judgment [DE 55] is GRANTED in part and DENIED in part. Barnes' motion for summary judgment [DE 61] is DENIED. Summary judgment is granted as to Barnes' claim for hostile work environment, but is denied as to Barnes' claims for race discrimination and retaliation. NIPSCO's motion for leave to strike or file a sur-reply is GRANTED [DE 72] insofar as the sur-reply's filing is allowed and has been considered by the Court for purposes of this ruling.

SO ORDERED.

ENTERED: July 18, 2017

/s/ JON E. DEGUILIO
Judge
United States District Court